# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KATHERINE CALAVAN, individually and )<br>On behalf of all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FIRST LOVE INTERNATIONAL )<br>MINISTRIES, STEVEN JOHNSON, )<br>JERRY WINSLOW, PAUL LONER, )<br>PHILIP GUSKE, ROBERT OPPERMAN, )<br>PHOEBE WILHELM, DALE GRAY, )<br>THOMAS CLINTON, ROBERT )<br>CLINTON, LOVING INDEED, INC., and )<br>JOHN DOE CO-CONSPIRATORS 1-100, )<br>)<br>Defendants. ) | No.<br><br>JURY TRIAL DEMANDED | |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION ................................................................................................. 4

PARTIES ........................................................................................................... 5

    A.   Plaintiff.............................................................................................. 5

    B.   Defendants....................................................................................... 5

    C.   Members of the First Love Solicitation Enterprise ......................... 7

FACTS ............................................................................................................... 7

    A.   Domestic and international policies universally condemn
institutionalizing children, except as a temporary last resort.......... 8

        1.   The United States has deinstitutionalized child welfare and
promoted the reunification of families domestically. ............ 8

        2.   The international community, including Kenya, supports the
deinstitutionalization of child welfare and promotes the
reunification of families.................................................... 10

    B.   The international community recognizes and condemns the problem of
orphanage trafficking. ..................................................................... 22

    C.   Defendants deceived Class Members into donating money and time to
First Love and the First Love Solicitation Enterprise without disclosing
their practice of orphanage trafficking........................................... 25

        1.   First Love solicits donors and voluntourists using social media,
websites, and email. ......................................................... 25

        2.   Plaintiff and other Class Members learn that First Love is engaged
in orphanage trafficking.................................................... 32

        3.   Plaintiff and other Class Members raise concerns regarding First
Love's illegal practices – and are threatened and warned to stay
silent by First Love. .......................................................... 42

        4.   The First Love Solicitation Enterprise includes organizations that
exploit Kenyan children for their own benefit and at the expense of
donors............................................................................... 46

CLASS ALLEGATIONS .................................................................................. 54

CAUSES OF ACTION ..................................................................................... 56

Count I: Violation of 18 U.S.C. § 1962(c)....................................................... 56

        1.   The association in fact. ...................................................... 56

        2.   The common purpose........................................................ 57

        3.   The roles of the participants.............................................. 57

        4.   Pattern of racketeering and predicate acts. ........................ 57

        5.   Affected interstate commerce. .......................................... 60

6.    Operating and Management ......................................................... 60

7.    RICO injury. ........................................................................... 62

Count II: Violation of 18 U.S.C. § 1962(D) (conspiracy to violate 18 U.S.C. § 1962(C)) .......................................................................................... 62

Count III: Violation of State Consumer Protection Acts ........................... 63

Count IV: Unjust Enrichment ............................................................. 68

PRAYER FOR RELIEF ...................................................................... 69

JURY TRIAL DEMAND ..................................................................... 70

Plaintiff Katherine Calavan ("Plaintiff" or "Ms. Calavan"), individually and on behalf of all others similarly situated, for her Class Action Complaint against Defendants First Love International Ministries ("First Love"), Steven Johnson, Jerry Winslow, Paul Loner, Philip Guske, Robert Opperman, Phoebe Wilhelm, Dale Gray, Thomas Clinton, and Bob Clinton (collectively, the "Board Members"), and Loving InDeed, Inc. ("Loving Indeed"), states as follows:

## INTRODUCTION

1. Every year, millions of people from wealthy nations such as the United States travel to poor countries, hoping to do good. University students want to spend a school break or part of a summer giving back, perhaps even to improve their CV. Christians go with their churches for one- or two-week mission trips. All seek the satisfaction of making a difference. For many, the destination is an orphanage, where they aim to bring joy to needy children in the brief time they can spare.

2. What the unsuspecting tourists and consumers don't know is that the U.S.-based companies who are raising money for orphanages in Africa and pushing the booming business of "voluntourism" sustain practices and institutions that do harm to children.

3. There is no such thing as a "good" orphanage, according to child development experts. Eighty years of research confirms that children do best in a family. They are far more likely to experience abuse, cruelty, or neglect in an institution than in any other setting. Even in a well-run facility, children do not develop normally.

4. In the United States, the institutionalization of children has almost completely stopped. Instead, governments offer services that can help families keep children with them; if that is not possible, they seek adoptive parents or foster families. While these solutions may be

imperfect, no experts are advocating going back to institutions.

5.      And the international community agrees. Through the United Nations Guidelines
for the Alternative Care of Children (2009), adapted by Kenya with the adoption of the
Guidelines for the Alternative Family Care of Children (2014),[1] and again reinforced by Kenya
in multiple policies including the 2013 National Standards For Best Practices in Charitable
Children's Institutions, it is universally recognized that the placement of children in institutions
should only occur as a last resort and then only on a temporary, short-term basis.

6.      The international community and Kenya thus require all efforts to be made to
support families to continue to care for their children and, if this is not possible, to place a child
in a family-based alternative care arrangement, such as, kinship care, foster care, guardianship,
or adoption – and not institutional care.

7.      Despite international consensus that no child should live in an orphanage except
as a last resort, Defendant First Love and its Board Members are raising money from American
donors and voluntourists to build, expand, and perpetuate its orphanages – called Charitable
Children's Institutions ("CCIs") in Kenya and other countries for children that would be better
off with their own families and in their own villages.  This is a practice condemned as
"orphanage trafficking."

8.      First Love preys on American donors for money to build, and voluntourists for
money to join mission trips to, CCIs that are unnecessary for long-term care and in contravention
of international norms. First Love does so by building a rich but deceptive tapestry of children in
need because they (i) live "in impoverished[sic] regions of the world"[2] or in "slums"; (ii) live

---

[1]
https://bettercarenetwork.org/sites/default/files/Guidelines%20for%20the%20Alternative%20Family%20Care%20of%20Children%20in%20Kenya.pdf
[2] https://firstloveinternational.com/

with extended family who are "extremely poor;" or (iv) "often" go "without food."[3]

9.      Specifically, as to Kenya, First Love repeatedly references "an otherwise hopeless situation in the Kibera slum" and children who live "in desperate poverty in slums in the Nairobi area of Kenya."[4]

10.     But most deceptively, First Love claims these children "have been orphaned through AIDS, disease, violence, or simply been abandoned by their parents."[5]

11.     In fact, First Love's orphanages are not filled with "orphans" as that word is commonly understood in America.

12.     In some instances, through a practice condemned as orphanage trafficking, child-finders target Kenyan families who are poor and offer to educate their children at a boarding school, holding out the prospect of a better life for the Kenyan children if they are educated. The Kenyan families are led to believe their children will return to them.

13.     In other instances, children in need arrive at First Love for short-term care, but First Love treats the children as if they have been committed long-term.

14.     The children arrive at First Love's Kenyan CCIs – and are instructed not to speak of their families. Rather, they are used to perform for American voluntourists and deny that their parents are still alive. First Love uses its CCIs and the children to raise money for themselves and to expand First Love's CCIs to hold hundreds of children, even though it is against Kenyan and international consensus practices.

15.     First Love also formed a network of similar corporations, such as Loving InDeed, and CCIs through which they promoted their orphanage trafficking in Kenya under the guise of

---

[3] https://firstloveinternational.com/cynthias-story/
[4] https://firstloveinternational.com/ministry/kenya/
[5] https://firstloveinternational.com/ministry/kenya/

good will to expand their reach to prospective donors and increase donations from unsuspecting

donors. This network is referred to herein as the First Love Solicitation Enterprise.

16.     First Love and members of the First Love Solicitation Enterprise raise millions of

dollars each year for the benefit of Defendants and enterprise members – and not for the

betterment of children.

17.     First Love can only raise this money by deceiving class members, which is

defined to include all persons in the United States who made donations of time or money to First

Love International Ministries or Loving InDeed, Inc. directly or for the benefit of Abba's House,

Little Lambs Kenya, or John Doe Co-Conspirators.

18.     Recently, Plaintiff and other donors have raised their concerns regarding First

Love's practices to Kenyan government officials abroad and to donor groups domestically. In

response, First Love has engaged in witness intimidation and other tactics designed to cause the

complainants to retract their allegations in violation of the law.

19.     Plaintiffs and putative class members have donated their time and money to First

Love and members of the First Love Solicitation Enterprise, believing that their donations were

for the betterment of children and consistent with international norms. Because the donations

were used in ways that contravene international norms at the direction of First Love and the First

Love Solicitation Enterprise, Plaintiff seeks compensatory and punitive damages, individually

and on behalf of class members, for violations of the Racketeering Influenced and Corrupt

Organizations Act and state consumer protection laws, and for unjust enrichment.

**JURISDICTION**

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because

this action arises under the laws of the United States, and 18 U.S.C. § 1964(c) for violations of

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

4

21.     This Court also has jurisdiction over the subject matter presented by this Class

Action Complaint because it is a class action arising under the Class Action Fairness Act of

2005, under 28 U.S.C. § 1332(d)(2), the proposed Class contains more than 100 members, the

aggregate amount in controversy exceeds $5,000,000, and at least one Class member is from a

state different from Defendants. Additionally, the Court has supplemental jurisdiction of the state

law counts as they arise from the same nucleus of facts as the RICO count.

22.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because First

Love is located in this District, and a substantial part of the acts or omissions giving rise to the

claims set forth herein occurred in this judicial district.

## PARTIES

### A.  Plaintiff

23.     Katherine Calavan is a resident of Jacksonville, Florida, and citizen of the United

States.  Ms. Calavan donated her time, money, and services to First Love, and was damaged as a

result of the acts alleged herein.

### B.  Defendants

24.     First Love International Ministries is a not-for-profit Illinois corporation based in

Rockford, Illinois. First Love's registered agent is Thomas M. Clinton, 2515 Highcrest Road,

Rockford, IL 61107.

25.     Thomas Clinton ("Tom Clinton" or "Clinton") is a resident of Rockford, Illinois

and citizen of the United States. Tom Clinton is the President/Executive Director of First Love.

26.     Robert Clinton ("Bob Clinton") is a resident of Southern Pines, North Carolina

and citizen of the United States. Bob Clinton is the Executive Vice President of First Love.

27.     Steven Johnson is a resident of Rockford, Illinois and citizen of the United States.

Johnson is the Chairman of the Board for First Love.

28. Jerry Winslow is a resident of Antioch, Illinois and citizen of the United States. Winslow is the Vice Chairman of the Board for First Love. Winslow is also the founder of Loving InDeed, Inc., discussed *infra.*

29. Paul Loner is a resident of Rockford, Illinois and citizen of the United States. Loner is the Treasurer for First Love.

30. Philip Guske is a resident of Rockford, Illinois and citizen of the United States. Guske is the Secretary for First Love.

31. Robert Opperman is a resident of Rockford, Illinois and citizen of the United States. Opperman is a Director of First Love.

32. Phoebe Wilhelm is a resident of Rockford, Illinois and citizen of the United States. Wilhelm is a Director of First Love.

33. Dale Gray, M.D. is a resident of Rockford, Illinois and citizen of the United States. Gray is a Director of First Love.

34. According to Kenya, the "Board of Trustees and the Members of the Board of Trustees are the owners or proprietors of the CCI. They are the administrating authority. They have direct responsibility for the existence of the CCI. All CCIs will have a Board of Trustees which must be legally registered."

35. Further, Kenya defines the "Role and Responsibilities of the Board of Trustees" as including:

> • To employ the management staff of the CCI, i.e. Manager/Director/Administrator. • Supervise the management board and ensure that the standards for care and protection of children in the CCI are adhered to. • Protect the investments and assets of the CCI on behalf of the child. • Ensure proper structures are put in place in the CCI.

36.     Loving InDeed, Inc. is an Illinois corporation with its principal place of business located in Antioch, Illinois. Winslow is the registered agent of Loving InDeed, Inc., to be served at 39802 N. Long Dr, Antioch , IL 60002.

### C. Members of the First Love Solicitation Enterprise

37.     Loving InDeed, Inc. is a member of the First Love Solicitation Enterprise.

38.     Little Lambs Kenya is a member of the First Love Solicitation Enterprise. Little Lambs Kenya is a project of the Africa Inland Mission International, Inc., whose headquarters in the United States is located in Peachtree City, Georgia.

39.     Abba's House is a member of the First Love Solicitation Enterprise. Abba's House holds itself out as a partner to Loving InDeed.

40.     Loving InDeed appears to be doing business as Abba's house, in that it maintains the website under its name (https://lovingindeed.com/abbashouse/), the phone number listed for Abba's House on its Facebook page - (847) 867-9400 – is the same phone number used by Loving InDeed,[6] the team members on Abba's House's Facebook Page include Winslow,[7] the copyright for Abba's House newsletters is to "Abba's House Kenya/Loving InDeed, Inc.,"[8] and Loving InDeed accepts and processes donations intended for Abba's House under its name.

41.     John Doe Co-Conspirators 1-100 are unknown persons or companies that engaged in the First Love Solicitation Enterprise and will be identified through discovery.

### FACTS

---

[6] https://www.facebook.com/pages/category/Nonprofit-Organization/CC-Abbas-House-366808503445785/
[7] https://www.facebook.com/pages/category/Nonprofit-Organization/CC-Abbas-House-366808503445785/
[8] https://mailchi mp/0d756b4e3f9a/abbas-house-year-end-newsletter-1341858?fbclid=IwAR1ciRemdN2UGV9JhQEDi-0QeawYVEqygJJH69hdPx8yTPcb10dO1tRLbVo

**A. Domestic and international policies universally condemn institutionalizing children, except as a temporary last resort.**

42.    The descriptions of domestic, Kenyan, and international policies below are non-exhaustive and intended to provide an overview of the universal consensus that the placement of children in institutions should only occur as a last resort and then only on a temporary, short-term basis.

**1. The United States has deinstitutionalized child welfare and promoted the reunification of families domestically.**

43.    The first orphanage was reportedly established in the United States in 1729 to care for white children, orphaned by a conflict between Native Americans and white people at Natchez, Mississippi. The proliferation of orphanages grew; between 1830 and 1850 alone, private charitable groups established 56 children's institutions in the United States.

44.    Many institutions were founded by wealthy members of society as acts of charity. Many of the resources used to operate these early institutions were from charity dollars, arising from the donors' genuine interest in providing services to the poor.

45.    However, when decisions about children's placements had to be made, such benevolent interests did not always guide decision-making. For example, in numerous situations children were placed as indentured servants in remote areas of the country despite parents' pleas to have their children returned home.

46.    The first White House Conference on Children was convened by President Theodore Roosevelt in 1909 so that "those engaged in the work of caring for dependent and destitute children could exchange ideas and experiences."

47.    Conference participants concluded that, wherever possible, a child should be placed in foster families and not in institutions. The consensus of this conference was that:

> home life is the highest and finest product of civilization. Children

8

should not be deprived of it except for urgent and compelling
reasons ...This consensus has formed the basis of child welfare
theory ever since.

48.     A significant step toward reducing the number of children placed in orphanages

was the passage of the Social Security Act in 1935 to provide help from the federal government

to assist states to provide care for children. The Aid to Families with Dependent Children

program provided financial assistance to families so that they might be better able to care for

their families at home and avoid having their children taken out of the home and placed with

other caregivers.

49.     By the 1960s, professionals in a variety of disciplines began to believe that the

very nature of institutions was in direct contrast to human nature.

50.     Numerous studies reflected that children raised in an institutional setting suffered

from the inability to bond, inability to effectively problem solve, inability to turn to others for

help, poor peer relations, disciplinary problems, and disruptive behavior.

51.     In 1980, Congress passed the Adoption Assistance and Child Welfare Act. This

Act was to establish a program of adoption assistance, to strengthen the program of foster care

assistance for needy and dependent children, to improve the child welfare, social services, and

aid to families with dependent children program. It was significant because it stressed the

importance of placing a child in the least restrictive and most family-like setting. The Act

discouraged out of home placements and called for the return of children to their family as soon

as possible.

52.     In 1993, the Family Support and Family Preservation Act was established and

lead to the Family Preservation and Family Support Services Program. The purpose of the

Program was "to prevent the unnecessary separation of children from their families, improve the

quality of care and services to children and their families, and ensure permanency for children by

9

reuniting them with their parents, by adoption or by another permanent living arrangement."[9]

>    **2. The international community, including Kenya, supports the deinstitutionalization of child welfare and promotes the reunification of families.**

53.     In 1989, the global community adopted the United Nations Convention on the Rights of the Child.[10] Kenya ratified the convention in 1990.[11]

54.     The Preamble to the Convention on the Rights of the Child explained the recognitions that gave rise to the Convention, stating in pertinent part:

The States Parties to the present Convention,

>                    *       *       *

> Convinced that the family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance so that it can fully assume its responsibilities within the community,

> Recognizing that the child, for the full and harmonious development of his or her personality, should grow up in a family environment, in an atmosphere of happiness, love and understanding,

> Considering that the child should be fully prepared to live an individual life in society, and brought up in the spirit of the ideals proclaimed in the Charter of the United Nations, and in particular in the spirit of peace, dignity, tolerance, freedom, equality and solidarity,… [12]

55.     Based on these and similar principles, the Convention set forth protections that

---

[9] https://www.acf.hhs.gov/opre/research/project/family-preservation-and-family-support-services-program-fp/fs-1994-2002#:~:text=In%201993%2C%20title%20IV%2DB,to%20child%20welfare%20prevent ive%20services.&text=The%20welfare%20and%20safety%20of,strengthening%20and%20preserving%20the%20family.

[10] https://treaties.un.org/doc/Treaties/1990/09/19900902%2003-14%20AM/Ch_IV_11p.pdf (last accessed Oct. 7, 2020).

[11] https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-11&chapter=4&lang=en (underline in original) (last accessed Oct. 7, 2020).

[12] https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-11&chapter=4&lang=en (underline in original) (last accessed Oct. 7, 2020).

should be implemented for the benefit of children globally, including by:

a. providing "respect [to] the responsibilities, rights and duties of parents or, where applicable, the members of the extended family or community as provided for by local custom, legal guardians or other persons legally responsible for the child, to provide, in a manner consistent with the evolving capacities of the child, appropriate direction and guidance in the exercise by the child of the rights recognized in the present Convention," Art. 5;

b. protecting the child's "right to know and be cared for his or her parents," Art. 7(1);

c. "respect[ing] the right of the child to preserve…family relations as recognized by law without unlawful interference, Art. 8(1);

d. "ensur[ing] that a child shall not be separated from his or her parents against their will, except when competent authorities subject, to judicial review determine, in accordance with applicable law and procedures, that such separation is necessary for the best interests of the child, Art. 9(1);

e. "respect[ing] the right of the child who is separated from one or both parents to maintain personal relations and direct contact with both parents on a regular basis, except if it is contrary to the child's best interests, Art. 9(3);

f. recognizing "the principle that both parents have common responsibilities for the upbringing and development of the child. Parents or, as the case may be, legal guardians, have the primary responsibility for the upbringing

11

and development of the child," Art. 18(1);

g.  protecting "the child against all other forms of exploitation prejudicial to any aspects of the child's welfare, Art. 38. [13]

56.     Article 16 of the Convention further provides: "No child shall be subjected to arbitrary or unlawful interference with his or her privacy, family, home or correspondence, nor to unlawful attacks on his or her honour and reputation." [14]

57.     Article 20 provides that, if a child needs to be "temporarily or permanently deprived of his or her family environment," primary consideration should be made to move the child to foster care or adoption – with institutionalization being the last resort. [15]

58.     In 2009, the United Nations General Assembly adopted a resolution welcoming the Guidelines for the Alternative Care of Children in connection with the 20th anniversary of the UN Convention on the Rights of the Child.[16]

59.     The Guidelines for the Alternative Care of Children were designed to, *inter alia,* "support efforts to keep children in, or return them to, the care of their family or, failing this, to find another appropriate and permanent solution, including adoption and kafala of Islamic law…." §I.2(a).[17]

60.     Thus, the Guidelines provide, in part:

---

[13] https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-11&chapter=4&lang=en (last accessed Oct. 7, 2020).
[14] https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-11&chapter=4&lang=en (last accessed Oct. 7, 2020).
[15] https://treaties.un.org/pages/ViewDetails.aspx?src=IND&mtdsg_no=IV-11&chapter=4&lang=en (last accessed Oct. 7, 2020).
[16] https://bettercarenetwork.org/sites/default/files/Guidelines%20for%20the%20Alternative%20Care%20of%20Children%20-%20English.pdf (last accessed Oct. 30, 2020).
[17] https://bettercarenetwork.org/sites/default/files/Guidelines%20for%20the%20Alternative%20Care%20of%20Children%20-%20English.pdf (last accessed Oct. 30, 2020).

a. "The family being the fundamental group of society and the natural environment for the growth, well-being and protection of children, efforts should primarily be directed to enabling the child to remain in or return to the care of his/her parents, or when appropriate, other close family members. The State should ensure that families have access to forms of support in the caregiving role." §II.A(3).

b. "Removal of a child from the care of the family should be seen as a measure of last resort and should, whenever possible, be temporary and for the shortest possible duration. Removal decisions should be regularly reviewed and the child's return to parental care, once the original causes of removal have been resolved or have disappeared, should be in the best interests of the child…." § II.B(14).

c. "Financial and material poverty, or conditions directly and uniquely imputable to such poverty, should never be the only justification for the removal of a child from parental care, for receiving a child into alternative care, or for preventing his/her reintegration, but should be seen as a signal for the need to provide appropriate support to the family." § II.B(15).

d. "The provision of alternative care should never be undertaken with a prime purpose of furthering the political, religious or economic goals of the providers." § II.B(20). [18]

61.    Similar to the UN Guidelines for the Alternative Care of Children (2009) and

---

[18]
https://bettercarenetwork.org/sites/default/files/Guidelines%20for%20the%20Alternative%20Care%20of%20Children%20-%20English.pdf (last accessed Oct. 30, 2020).

other international treaties and guidelines, Kenya has adopted numerous laws and regulation

reflecting the same values and consensus.

62.     By way of example only, in April 2013, Kenya issued its National Standards for

Best Practices in Charitable Children's Institutions.[19] According to Kenya's Permanent

Secretary, Ministry of Gender, Children and Social Development:

>       These principles include the placement of children in CCIs as a last
>       resort when all other family based care placements have failed, the
>       need for comprehensive care and protection of children while in
>       CCIs, and the significance of their eventual exit from CCIs within
>       the shortest time possible. CCIs should not become permanent
>       residences for our children. It is best that they grow and develop
>       within the family and community set up.
>
>       It is advised that the owners/proprietors, board of trustees, donors,
>       management and staff of all CCIs in Kenya make references to
>       these Standards as they continue to support and run children's
>       institutions.

63.     Further, Kenya's Secretary for Children Affairs explained that the National

Standards for Best Practices in Charitable Children's Institutions were "developed with the aim

of assisting Charitable Children's Institutions (CCIs) boost their capacity for determining which

children need to be admitted into CCIs, how to provide adequate care and protection to the

children and how to plan the eventual exit of the children back to their families and

communities."[20]

64.     The Secretary further explained that the "standards will promote the care and

protection of children within CCIs while emphasizing the importance of having children grow in

a family environment. Children should be in CCIs only as a temporary measure, when it is

---

[19]

https://bettercarenetwork.org/sites/default/files/National%20Standards%20for%20Best%
20Practices%20in%20Charitable%20Children%27s%20Institutions.pdf
    [20] *Id*. at 5.

14

absolutely necessary and as a last resort. CCIs are therefore urged to first attempt to care and support the children within their families and communities before admitting them in CCIs."[21]

65.     Kenya's National Standards require that CCIs "with all its stakeholders including those supporting CCIs in one way or another" be guided by 12 Primary Principles, including:

> 1. ***Upholding Family Care***: The family being the fundamental unit of a society and the natural environment for the growth, well-being and protection of children, all efforts should primarily be directed at enabling the child to remain in or return to the care of his/her parents, or when appropriate, other close family members.

> 2. ***Contact with Family and the Community***: All decisions concerning admitting children into CCIs should take full account of the need in principle, to maintain the child as close as possible to his/ her habitual place of residence, in order to facilitate contact and potential reintegration with his/her family and to minimize disruption of his/her educational, cultural and social life.

> 3. ***Necessity***: Children should only be in an institution as a matter of necessity. This means that all actors should support children to remain with, and be cared for by, their family. Removing any child from his/her family should be a measure of last resort, and a rigorous participatory assessment is required before any such decision is taken.

> 4. ***Do no Harm***: All CCIs must be conscientious on the possibilities of harming children in their day to day work and decisions. They should therefore be on the lookout not to harm the child and to avoid unintended negative impacts when carrying out their developments and other interventions.

> \*\*\*

> 7. ***Poverty Not a Reason***: Financial and material poverty, or conditions directly and uniquely attributed to such poverty, should never be the only justification for the removal of a child from parental care. Instead, such conditions should be seen as a signal for the need to provide appropriate support to the family.

> \*\*\*

> 9. ***Motives for Establishing a CCI***: The establishment of a CCI should never be undertaken with the sole purpose of furthering

---

[21] *Id.*

15

political, religious or economic goals of the care providers. Instead, it should be for the purpose of offering children short term care and protection while long term solutions on family based care are sought.

\*\*\*

11. ***Not for Profit***: CCIs must not be established for fundraising, individual gain or personal enrichment. Rather, the best interests of the child should always prevail.

12. ***Accountability and Transparency***: CCIs shall be open and explain their actions and operations to both the rights holders and duty bearers.

66.     The National Standards provide:

Length of a Child's Stay in a CCI The length of a child's stay in a CCI should be captured at the point of admission and factored in the child's individual care plan. The CCIs should make every effort to reintegrate children back to their families immediately or find alternative family-based care arrangements such as adoption, foster care, guardianship and kinship. Children should stay in a CCI for a maximum of 3 (three) years. Under very special circumstances, a CCI may apply for extension of stay before a court of law. **CCIs should not use education as a reason for admitting or extending a child's stay as a child's education can be supported while the child is in family set up.[22]**

67.     The National Standards further provide:

Children should stay in a CCI for a maximum of 3 (three) years. Under very special circumstances, a CCI may apply for extension of stay before a court of law. CCIs should not use education as a reason for admitting or extending a child's stay as a child's education can be supported while the child is in family set up.

68.     Kenya's adoption of the Guidelines for the Alternative Family Care of Children was intended to reflect the "Government of Kenya's international commitments to the United Nations Convention on the Rights of the Child (UNCRC), the African Charter on the Rights and Welfare of the Child (ACRWC), the Hague Convention on the Protection of Children and Co-

---

[22] *Id*. at 49 (emphasis supplied).

16

operation in Respect of Inter-Country Adoption 1993 and the Guidelines for the Alternative Care

of Children (UN 2010)."[23]

69.     In the forward to the Kenya Guidelines, Kenya's Cabinet Secretary, Ministry of

Labour, Social Security and Services, explained:

> The family is a nurturing and caring environment and is the ideal
> place in which to raise a child. Growing up in a family helps
> children to develop a sense of self-esteem, belonging, family
> values, and religious and cultural identity. Due to the nature of
> family care, children learn to interact better with the community
> and are better equipped to face life challenges than those placed in
> institutions. This is because most institutions are highly structured,
> controlled and operate according to strict routines.
>
> As noted in the UNCRC, all efforts need to be made to support
> families to continue to care for their children and, if this is not
> possible, to place a child in a family-based alternative care
> arrangement, such as, kinship care, foster care, guardianship or
> adoption. A range of alternative care services should be available
> and institutional care should be a temporary measure and used only
> as a last resort. When institutional care is deemed appropriate for a
> limited number of children, it should be provided in a small
> family-like environment.[24]

70.     The Kenyan Guidelines for the Alternative Family Care of Children further

explain:

> **Rationale for Family-based Care**
>
> Years of research and experience have shown that institutional care
> has a negative impact on a child's social, emotional, cognitive and
> intellectual development. Children are not given the nurturing love
> and individual attention they need for their brains to develop and
> for them to grow into healthy, strong adults. The experience is
> particularly damaging for children less than three years of age.
>
> Inappropriate care and protection of children in some institutional
> care settings can lead to violations of children's rights, such as:
> lack of child participation; discrimination; poor nutrition;
> inadequate sanitation and hygiene; systematic physical and sexual

---

[23] Kenya Guidelines, at vii.
[24] *Id*.

abuse; and lack of education, health and other basic services. Children are often not provided with the personal care, life skills and other services to prepare them for adulthood and life outside an institution.

It has also been established that family-based care is more cost-effective than institutional care. In South Africa, for example, the monthly cost of statutory residential care can be six times more than the cost of providing care to children living in vulnerable families (i.e. home-based care and support for families affected by HIV and AIDS), and four times more expensive than statutory foster care or adoption.

The family is a more nurturing, caring environment for a child to be raised in. Growing up in a family helps a child to develop a sense of self-esteem and belonging, family values, religious and cultural identity. Due to the nature of family care, children learn to interact better with the community and to face life challenges better than those in institutions. This is because families are more natural while most institutions are highly structured, controlled and operated on routine.

As noted in the UNCRC, all efforts need to be made to support families to continue to care for their children and, if this is not possible, to place a child in a family-based alternative care arrangement, such as kinship care, foster care, guardianship, adoption or kafaalah. A range of alternative care services should be available and institutional care should be a temporary measure and used as a last resort. When institutional care is deemed appropriate for a limited number of children, it should be provided in a small family-like environment.[25]

71.     Both of these documents make it clear that, in Kenya – consistent with international norms, institutionalization should be a temporary, last resort measure and should not be used for the long-term care of children.

72.     The Kenyan Guidelines reinforce the limited role that CCIs should have in Kenya:

CCIs should have proper gatekeeping measures in place to ensure that placement in institutional care is in the best interests of the child and a last resort. CCI social workers should counsel parents or legal guardians wishing to relinquish a child permanently or for a temporary period. The care providers should establish linkages

---

[25] *Id.* at 5.

with interdisciplinary social services to address the reasons for the child being abandoned. If it is determined to be in the best interests of the child to separate him/her from the parents/family, the social/care worker should first look for other family members to place the child with. If that is not possible, the child should be placed in a **CCI temporarily, for the shortest period possible and a permanent family placement found within a reasonable period, preferably not more than three years as recommended in the NSBP in CCIs.**[26]

73. On November 1, 2017, Kenya imposed a moratorium on the registration of

Charitable Children's Institutions, issuing a directive stating:

(i) Many children are inappropriately placed in CCI's yet they could desirably be placed for Foster Care, Guardianship or Local Adoption with Kenyan families. In this respect, it is evidence that such children are put in institutions under circumstances that are not in their best interest and are accordingly denied the opportunity to be raised within families.

(ii) It was evident that some of the Children's Homes were involved in unscrupulous practices which may include Child Trafficking.[27]

74. A copy of the first page of the directive follows:

---

[26] *Id*. (emphasis supplied)
[27] https://www.bettercarenetwork.nl/nw-17382-7-3673126/nieuws/kenia_schort_de_registratie_van_nieuwe_kinderhuizen_op.html (last accessed Oct. 30, 2020).



75.     In December 2019, the United Nations General Assembly adopted the Resolution

on the Rights of the Child.

76.     The Resolution focuses specifically on children without parental care. It

emphasizes the importance of growing up in a family environment and the right of the child to a

family, highlights the rights of children with disabilities with respect to family life, opposes the

unnecessary separation of children from their families and the unlawful or arbitrary deprivation

of liberty of children, encourages efforts to reunify families where in the best interests of the

child, and stresses that children should not be separated from their families solely due to poverty

or lack of access to resources.[28]

---

[28] *See* 2019 Resolution on the Rights of the Child, available at
https://undocs.org/A/74/395 (last accessed Oct. 7, 2020).

77.    The Resolution provides in pertinent part:

26. *Notes* that children without parental care are more likely than their peers to experience human rights violations, such as exclusion, violence, abuse, neglect and exploitation, and in this regard expresses deep concern on the potential harm of institutionalization and institutional care to children's growth and development;

27. *Recognizes* that many children living without parental care have families, including at least one parent alive and/or relatives, and in this regard encourages actions to achieve family reunification unless it is not in the best interests of the child;

28. *Stresses* that no child should be forced to give up family connections in order to escape poverty, or to receive care, comprehensive, timely and quality health services or education, or because they are in contact with the law;

\*\*\*

30. *Also recognizes* that financial and material poverty, or conditions directly and uniquely imputable to such poverty, should never be the only justification for the removal of a child from the care of his or her parents or primary caregivers and legal guardians, for receiving a child into alternative care or for preventing his or her reintegration, but should be seen as a signal for the need to provide appropriate support to their family, benefiting the child directly;….[29]

78.    The United States government supports care reforms in Kenya and globally. In 2012, Congress created the Assistance for Orphans and Other Vulnerable Children in Developing Countries Act of 2005, 22 U.S.C. § 2152f (Public Law (PL) 109-95), to ensure that international assistance to vulnerable children in developing countries is comprehensive, coordinated, effective, and built on evidence-based good practices.

79.    The Departments of Agriculture, Defense, Health and Human Services, Labor, and State; the Peace Corps; the U.S. Agency for International Development (USAID); and the

---

[29] *Id.* (italics in original).

21

U.S. President's Emergency Plan for AIDS Relief (PEPFAR) created the U.S. Government

Action Plan on Children in Adversity.

80.     The Action Plan has three principal objectives, including: "Put Family Care First:

U.S. Government assistance will support and enable families to care for their children, prevent

unnecessary family-child separation, and promote appropriate, protective, and permanent family

care."

### B. The international community recognizes and condemns the problem of orphanage trafficking.

81.     In 2018, the United States Department of State issued the Trafficking in Persons

Report, which focused on the problem of human trafficking. According to the State Department,

human trafficking "undermines national security, distorts markets, and enriches transnational

criminals and terrorists, and is an affront to the universal values we as Americans hold dear."[30]

82.     The Secretary of State described the purpose of the report as follows:

> The 2018 Trafficking in Persons Report is an essential State
> Department tool used to shed light on the darkness where modern
> slavery thrives and to highlight specific steps each government can
> take to protect victims of human trafficking, prevent trafficking
> crimes, and prosecute traffickers in the United States and around
> the world. The findings in this  report help inform policymakers,
> law enforcement, and civil society on gaps and areas of concern, as
> well as serve as a roadmap forward to end the scourge.

83.     The Report states that: "The international community agrees that a family

caregiving setting, or an alternative solution that is appropriate and culturally sensitive, is the

most conducive environment for the growth, well-being, and safety of children."

84.     The Report reinforces the international norms that have existed for decades:

> Removal of a child from the family should only be considered as a
> temporary, last resort. Studies have found that both private and

---

[30] https://www.state.gov/wp-content/uploads/2019/01/282798.pdf, at 4.

> government run residential institutions for children, or places such
> as orphanages and psychiatric wards that do not offer a family-
> based setting, cannot replicate the emotional companionship and
> attention found in family environments that are prerequisites to
> healthy cognitive development.

85.     Highlighting the particular problem of orphanage trafficking, the Report states:

"Yet, about eight million children worldwide live in these facilities, even though an estimated 80

to 90 percent of them have at least one living parent. The physical and psychological effects of

staying in residential institutions, combined with societal isolation and often subpar regulatory

oversight by governments, place these children in situations of heightened vulnerability to

human trafficking."

86.     The Report explained that human trafficking is not limited to sex trafficking and

placing children as labor in factories or homes. According to the Report, it includes "institutional

complicity," which involves:

> the practice of recruiting children for the facility. 'Child finders'
> travel to local villages or communities— often those affected by
> war, natural disaster, poverty, or societal discrimination—and
> promise parents education, food security, safety, and healthcare for
> their children. Instead of fulfilling those promises, many
> orphanages use the children to raise funds by forcing them to
> perform shows for or interact and play with potential donors to
> encourage more donations. Orphanages have also kept children in
> poor health to elicit more sympathy and money from donors.

87.     Institutional complicity also includes the condemned practice of "voluntourism,"

which the Report describes as follows:

> Foreign travelers wishing to include a charitable element in their
> vacation often partake in "voluntourism" at orphanages, which
> child advocacy organizations and governments have documented
> as harmful. Volunteering in these facilities for short periods of
> time without appropriate training can cause further emotional
> stress and even a sense of abandonment for already vulnerable
> children with attachment issues affected by temporary and
> irregular experiences of safe relationships. In addition, it is rare
> that background checks are performed on these volunteers, which

23

can also increase the risk of children being exposed to individuals with criminal intent. Voluntourism not only has unintended consequences for the children, but also the profits made through volunteer-paid program fees or donations to orphanages from tourists incentivize nefarious orphanage owners to increase revenue by expanding child recruitment operations in order to open more facilities. These orphanages facilitate child trafficking rings by using false promises to recruit children and exploit them to profit from donations.

88.     The recognition of international consensus against orphanage tracking was recently codified in Australia's Modern Day Slavery Act, effective January 1, 2019.

89.     During the establishment of the Act, Australia's Joint Standing Committee on Foreign Affairs, Defence, and Trade "heard serious concerns about a specific type of child exploitation known as 'orphanage trafficking' or 'paper orphaning' involving children in overseas residential institutions (or 'orphanages') particularly in developing countries. These institutions have been established to take advantage of 'voluntourists' seeking to support 'orphans' but do little due diligence on the institution."[31]

90.     The Committee reported that it "heard consistent evidence that children subject to orphanage trafficking are removed from their families and placed in residential institutions to attract funding and donations from foreign tourists. In many cases, parents are willfully deceived by recruiters who visit poorer rural communities on behalf of orphanage directors to place their children in institutions on the promise of an education and a better life."

91.     The Committee reported that a group of Australian NGOs observed: "Children in orphanages are often kept in slavery like conditions, fully owned by orphanage directors and exploited for profit through forced 'cultural' performances for tourists, forced begging, and

---

[31]
https://www.aph.gov.au/Parliamentary_Business/Committees/Joint/Foreign_Affairs_Def
ence_and_Trade/ModernSlavery/Final_report/section?id=committees%2Freportjnt%2F0
24102%2F25036

24

forced interaction and play with visitors. Children are often kept in poor health, poor conditions and are malnourished in order to elicit more support in the form of donations and gifts."

### C. Defendants deceived Class Members into donating money and time to First Love and the First Love Solicitation Enterprise without disclosing their practice of orphanage trafficking.

#### 1. First Love solicits donors and voluntourists using social media, websites, and email.

92.     First Love operates two children's homes in Kenya.  The First Love Kenya's Children's Home is located near Nairobi and the Riziki Children's Home is located near Kilifi.

93.     First Love also constructed Daraja House, which is supposed to house children when they turn 18 (and become what is known as "Care-Leavers") and must leave First Love's CCIs.

94.     First Love claims it is "a non-denominational mission agency founded for the purpose of bringing love and hope to people residing in impoverished regions of the world."[32]

95.     In fact, First Love preys on American donors for money to build CCIs that are unnecessary and in contravention of international norms.

96.     First Love does so by building a rich but deceptive tapestry of children in need because they (i) live "in impoverished[sic] regions of the world"[33]; (ii) live in "slums"[34]; (iii) live with extended family who are "extremely poor;"[35] and (iv) "often" go "without food"[36];

97.     Specifically, as to Kenya, First Love repeatedly references in marketing materials to churches, donors, and voluntourists: "an otherwise hopeless situation in the Kibera slum"[37]

---

[32] https://firstloveinternational.com/
[33] https://firstloveinternational.com/
[34] https://firstloveinternational.com/cynthias-story/
[35] https://firstloveinternational.com/cynthias-story/
[36] https://firstloveinternational.com/cynthias-story/
[37] https://firstloveinternational.com/ministry/kenya/

25

and children who live "in desperate poverty in slums in the Nairobi area of Kenya."[38]

98.     But most deceptively, First Love claims these children "have been orphaned through AIDS, disease, violence, or simply been abandoned by their parents."[39]

99.     By way of example, on its website, First Love describes the story of "Cynthia," who "was one of the first little girls that First Love brought into the original First Love Children's Home."[40]



100.    After Cynthia's parents allegedly died, First Love claims to have "saved" Cynthia by taking her from her aunt and uncle who were "extremely poor and often went without food." First Love claims that, following Cynthia, it continued to take in orphan girls, eventually creating a home "to over 100 boys and girls."[41]

101.    This type of story reflects First Love's use of poverty to justify long-term placement of "over 100 boys and girls" in an institutional setting – without disclosing the numerous ways it violated international and Kenyan standards in just this example.

---

[38] https://firstloveinternational.com/ministry/kenya/
[39] https://firstloveinternational.com/ministry/kenya/
[40] https://firstloveinternational.com/cynthias-story/
[41] https://firstloveinternational.com/cynthias-story/

102.     First Love solicits churches and individuals to make donations so that it can continue to expand its CCIs and to join First Love as voluntourists:

> First Love Kenya currently operates several ministries to meet the physical and spiritual needs of those living in desperate poverty in slums in the Nairobi area of Kenya. We would love to partner with your church or organization to bring food to the hungry through one of our programs, or perhaps you are interested in joining our team in Kenya. If you feel called to serve the people of Kenya, we want you on our team.[42]

103.     Ms. Calavan received information in 2017 about the opportunity to travel to Kenya to visit First Love's CCI and volunteer her time to help the "orphans" who lived there.

104.     A trained social worker, Ms. Calavan was excited about the prospect of donating her time to help children in need.

105.     Ms. Calavan contacted Tom Clinton to volunteer her time. At that time, Mr. Clinton was planning a mission trip in June 2017 to First Love's CCI in Nairobi and he invited her to participate.

106.     Neither Mr. Clinton nor First Love required Ms. Calavan to undergo a background check, or other application process, before the invitation, nor did anyone check on her credentials as a social worker.

107.     Ms. Calavan committed and began the process for obtaining a visa to travel to Kenya.

108.     Tom Clinton gave Ms. Calavan and the other voluntourists very specific instructions to lie to the Kenyan authorities about the reason for her trip, stating in an email dated April 19, 2017: "Please also see the revised instructions for applying for the Kenya visa which I have attached to this email message. It tells you to put 'tourist' for reason for travel and 'to visit

---

[42] https://firstloveinternational.com/ministry/kenya/

friends'[]or 'tourist' for the reason of your trip. I hope all goes well. God bless you! Tom"

109. The attachment to the email was on First Love letterhead and was titled "Applying for a Kenya Visa." The attachment included highlighted language, instructing:

For the reason for travel put down "tourist" and for reason for entry put down "visit friends"

A copy of the first page follows:



110. During that first trip, Ms. Calavan observed that the children were not receiving any social work or therapy services. Ms. Calavan thus offered to provide art therapy to the children.

111. Tom Clinton agreed and provided Ms. Calavan with space to set up a therapy room. Over time, Ms. Calavan also began training other social workers, and providing intervention therapy.

112.     Over the course of the next two years, Ms. Calavan returned to First Love on nine mission trips, typically once per quarter.

113.     Each time, instructions for obtaining visas were similar, advising the voluntourists to lie about the reasons for their trip. For example, on November 15, 2018, First Love again sent Calavan and other voluntourists an email with instructions for obtaining the visa by misrepresenting the purpose of their visits.

114.     To facilitate the therapy, Ms. Calavan purchased and brought supplies with her on these trips. For example, on her second trip, Ms. Calavan brought 100 pounds of art supplies for use in the therapy sessions with the children.

115.     During this time, Ms. Calavan was joined by numerous other voluntourists. For example, one voluntourist wrote a blog in April 2018 regarding her trip to First Love's CCI in Karen, Kenya. There, she met with Chris, the manager of the home in Kenya.

116.     She described how Chris promoted First Love's CCI:

> The children come from all over Kenya. Chris told us that originally the plan was to house only girls but then he saw the need for a home for siblings- which included boys. There are 116 children and 10 of them attend a boarding school year round, so they were not all around at the time.  These children have been orphaned because of AIDS, disease, violence or simply been abandoned by parents (First Love International, 2017).[43]

117.     In her public report, the voluntourist stated that she "asked Chris where the funding comes from for a place like this and he said from private individuals from the United States."[44]

---

[43] https://ufveastafricainternships.com/2018/04/05/caring-for-kenyas-most-vulnerable/ (last visited October 30, 2020).

[44] https://ufveastafricainternships.com/2018/04/05/caring-for-kenyas-most-vulnerable/ (last visited October 30, 2020).

118. First Love has a number of ways it seeks donors from the United States, including through churches:[45]



119. In addition to voluntourists, First Love seeks donations online:



120. First Love also solicits donors and voluntourists through its Facebook page. For example, in early 2020, the First Love Executive Director posted the following on Facebook in anticipation of their Summer 2020 trip:

---

[45] https://www.ccctucson.org/events/event/578/first-love-orphanage-christmas/2019-11-03 (last visited October 30, 2020).



121.     Clinton represented that the trip would be focused on, *inter alia,* (i) "Kids' Clubs at schools located in the Kibera slum of Nairobi. Child evangelism is at the heart of this outreach ministry"; and (ii) "Building Repair Projects at the First Love Kenya Children's Home…."

122.     In the Facebook message, Clinton advised that the cost "for this 2 week ministry trip is approximately $3,650 per person" for airfare, lodging, food, land transportation and "a donation towards the cost of materials and supplies."

123.     Clinton further explained that "all donors will receive a tax-deductible receipt for their gift from First Love."

124.     Clinton encouraged potential donors to commit soon, stating: "Linda and I are in Kenya right now and we have a bunch of kids over here who would love to meet you!!!" He included the following pictures:

Linda and I are in Kenya right now and we
have a bunch of kids over here who would
love to meet you!!!

Dr. Tom Clinton
President/CEO
First Love International Ministries
PO Box 15836, Loves Park, IL 61132
Phone: 815-222-8481





0026                          4 Comments  3 Shares

        rb Like        0 Comment        Share

125.    By her fourth or fifth trip to First Love's CCI, Ms. Calavan began to have serious

concerns about First Love's practices.

### 2. Plaintiff and other Class Members learn that First Love is engaged in orphanage trafficking.

126.    In 2019, Mr. Clinton appointed Ms. Calavan the Director of Social Services for

the First Love CCI. This appointment included the use of a designated office to work with the

children at the CCI.

32

127. Both before her appointment and confirmed during her time as the Director of Social Services, Ms. Calavan learned of First Love's serious violations of international consensus on orphanage trafficking and Kenyan law.

128. Examples of First Love's practices that violate international consensus and Kenya's National Standards include the following.

       **a. First Love established CCIs with the purpose of furthering political, religious or economic goals of First Love, rather than the purpose of offering children short term care and protection while long term solutions on family-based care are sought.**

129. First Love did not use its CCI as a temporary measure of last resort, but as the long-term residence of children in its care.

130. As a social worker, Ms. Calavan was provided access to the children's files. Those files revealed that many of them had been at the CCI for longer than three years (the maximum permitted under Kenyan law and longer than permitted under international norms), and many had been at the CCI without an order of commitment (required under Kenyan law and international norms).

131. Moreover, it was clear that First Love was using the CCIs to further its own economic gain and not for the best interests of the children.

132. For example, First Love knew that it could raise more money on donor sponsorships for younger children than for older children.

133. In November 2019, First Love CCI staff told Ms. Calavan that First Love was intending to release 30 older children (without any planning for their safety, care, or transition to family members as required by Kenyan law and international norms) to make room for younger children.

134. In November 2019, Chris Okuna told Ms. Calavan "we need to get rid of the older

children and add more bunk beds to fill the place with young children." He suggested that they build a third tier on the existing bunk beds.

135.     The 30 older children were released without proper planning for their safety in December 2019.

136.     Moreover, despite the November 1, 2017 moratorium on CCIs in Kenya, First Love forged ahead raising money to build and open Daraja house, which it called a bridge from the "orphans" it raises to adulthood when they turn 18.

137.     First Love states on its website:

> First Love has constructed Daraja House in order to go full-circle
> with the orphan children God brings to us.  We feel that God
> would have us care for these kids just like any of you would care
> for your own children.   The Kenyan Children's Department
> requires that once a child reaches the age of 18 he/she must move
> off the property of a children's home or orphanage.  Since we do
> not want to just send our older kids back to the slums, we have
> opened a transition home for them, which we are calling Daraja
> (bridge in English) House. This building serves as a "bridge" from
> youth to adulthood for our older young people as they finish up
> high school, go to college, or get their first jobs.[46]

138.     Without ever mentioning the moratorium, First Love made multiple representations which would lead donors to believe that the building and operation of Daraja House was permitted by law.

139.     In addition to be being a violation of the moratorium, once built, First Love began using Daraja House as a youth hostel for travelers for which it charged money, rather than as the bridge for Care-Leavers.

140.     Similarly, despite the moratorium on CCIs, First Love continued in 2019 and 2020 to raise money to build The Mtwapa Rescue Center.

---

[46] https://firstloveinternational.com/ministry/kenya/

141. Tom Clinton admitted to Ms. Calavan that he was aware of the moratorium but was going to build the center anyway.

142. As of December 2019, at least $240,000 had been raised from donors to build The Mtwapa Rescue Center without disclosing to the donors that Kenya had instituted a moratorium on the registration of new CCIs.

**b. First Love failed to implement proper gatekeeping measures to ensure that placement in institutional care is in the best interests of the child and a last resort.**

143. Rather than provide a place for the government to place children as a temporary last resort, First Love accepted children from child finders who brought the children to First Love from hundreds of miles away contrary to Kenyan regulations and international norms.

144. First Love failed to counsel and support families to continue to care for their children.

145. First Love did not provide any counsel or support to families to continue to care for their children.

146. First Love failed to use placement of children in First Love CCIs as a temporary measure, and instead regularly kept children in the CCIs for longer than three years.

147. From the outset, Tom Clinton and First Love gave Ms. Calavan access to the children's "official" files.

148. As she began to review the files and meet the children, she found that many of the files lacked birth certificates or appropriate documentation of where the children were from.

149. While court orders were required to permit the institutionalization of the children, many of the files lacked the appropriate court orders or had expired orders.

150. While Kenyan policies prohibited institutionalization for longer than three years,

the files reflected (and the children described being) institutionalized for much longer (many in excess of 10 years).

151.     And, despite learning over time that many of these children had living family members, there was no record of the required home visits or attempts to reunite the children with their families.

152.     When Ms. Calavan brought these issues to Tom Clinton's attention, he explained that "we are under God's authority to be here," not under the authority of the Kenyan government or its laws. Clinton claimed, "we have a right by God to be here to save these children," and that Kenya did not know what it was doing.

153.     For example, in November 2019, twin children from Mombasa were brought to First Love's CCI in Nairobi – a 300-mile trip or more than 8 hours by car.

154.     During a meeting at First Love, Ms. Calavan asked Tom Clinton and Chris Okuna if the government had placed the twins in such a far location from their hometown.

155.     During this meeting, Mr. Okuna stated that Kevin Wanga, a First Love social worker, would be traveling to retrieve more children. Such a practice is called orphanage trafficking.

156.     Many of the children at the First Love CCI had parents or other family members who could care for them. However, First Love or its agents promised these families that their children would receive an education or medical care (which they did not) if their children came to live at First Love.

157.     For example, the mother of a girl named Francisca from Kisumu was told that her daughter would receive medical care for sickle cell anemia if she sent her to First Love. However, First Love does not have any medical staff and does not ensure that the children

receive appropriate medical care.

158. In another example, in or about 2018, Tom Clinton and Linda Clinton told Ms. Calavan that a girl named "Purity" had been recruited to come to First Love and was told to lie about her biological mother, i.e., that she was dead.

159. Yet First Love did not attempt to reunite Purity with her mother.

160. On May 28, 2020, Ms. Calavan received an email from another former volunteer at First Love. She stated that "Purity" had recently been released by First Love and sent back to her mother. The volunteer stated that Purity had recently called her, explaining in the email:

> Another extremely disturbing piece of info that I've been wanting to email about, is that Purity contacted us to ask us to please forgive her mother. She said her mother was deceived by a woman who was recruiting children to come to First Love. Her mother was told that First Love was a boarding school and the woman collected the boarding school fees from her mother. Not until Purity was separated from her mother, was she told to lie and say she didn't have a mother. Purity felt trapped & scared & stuck and felt like she had no choice but to go along with it. Purity does not know the amount her mother paid the woman and she has never seen her ever again. She said she felt horrible lying all those years but her & her mother were afraid to speak up and didn't know how to handle the situation.

161. Evidence of the orphanage trafficking includes but is not limited to children without proper committal orders from the Kenyan government, 23 children at First Love with expired committal orders, many missing birth certificates, and children who were from villages hundreds of miles away from First Love.

162. First Love did not have any practices in place to ensure that placement in institutional care is in the best interests of the child and a last resort.

### c. First Love failed to create a small, family-like environment in its CCIs and instead continued to increase the size and institutional nature of the CCIs.

163. As reflected above, First Love had no intention of creating a small CCI. Instead, its focus was continuous growth. Pre-COVID, the First Love Kenya CCI housed approximately 120 children.

164. Ms. Calavan witnessed First Love and its network discussing and building three-level bunkbeds to increase the number of children they could house.

165. Moreover, physical abuse was rampant at First Love. The abuse included caning and whipping with electrical cords.

166. For example, one volunteer reported in October 2019 to Tom Clinton and a mission paster that children at First Love's CCI had reported abuse to her and that she had observed a supervisor at the CCI holding a cane while monitoring a study hall session.

167. Subsequently, a nurse was brought in to investigate the allegations and ask the children about the abuse. The nurse reported to Ms. Calavan and Linda Clinton that 98 of the children confirmed they received caning or beatings at First Love.

168. Tom Clinton asked Ms. Calavan to conduct therapy sessions with the children. Ms. Calavan requested that Linda Clinton participate in the group therapy sessions.

169. During these sessions, 18 children reported and told their own stories of being abused and canned, beaten with electrical cords, and slapped in the face.

170. They also reported that staff pulled their ears and made them kneel for hours at a time.

171. As examples only, two boys reported that "they were made to kneel for 2 hours on a broom stick. Kevin then used a cane to hit them on their legs, back, buttocks and calves." And

38

a girl reported that she was hit with a cane 20 times on her ring finger.

172. Children reported that one of the male social workers made sexualized comments to the girls, such as "you would like Sammy's big penis."

173. As part of this session, the children were asked to write down what happened to them. Excerpts of those letters include:

        a. "He (Kevin) has made many of my sisters and brothers to have a lot of marks on our body by the beatings";

        b. "How we are beaten by Cate and Kevin…";

        c. "We wish babu and shosho to learn things that are happening here and to please fire them. And to protect us…"

        d. Referring to another student, "he was beaten like a donkey."

174. The abusers, employees of First Love, also used the children as servants, bringing some of them to their homes and the homes of others to work as maids or house girls. When the Department of Children's Services would investigate, the employees would hide the children, saying it was to "protect" them.

175. Although this abuse was reported to Mr. Clinton, he refused to fire the abusers. Ms. Calavan and Mr. Clinton corresponded via text message regarding the abuse and his response.

176. Ms. Calavan (who was in the state of Georgia) also discussed these abuse allegations with Mr. Clinton (who was in Kenya) via video conference. Tom Clinton stated that the abuse allegations should be handled internally for fear of conflicts with the Church, donors, and the Government.

177. Specifically, Tom Clinton said on the recorded video conference:

> we are not going to bare all to the public and church…Like I said, I
> said we're gonna have to guard our speech with the general public
> and we're gonna have to deal with it in-house with those kinds of
> things. We're gonna have to be careful the way we word things
> with Erwin, and the Church, and Christ Community, and other
> people that question us about this.

178.    Mr. Clinton also told Ms. Calavan: "We cannot share every detail of what you

discovered. We can't." While Ms. Calavan emphasized that they need to tell the truth, Mr.

Clinton said: "we are not going to tell every detail."

179.    First Love thus failed to create the small, family-like environment required by

international and Kenyan norms.

180.    In sum, First Love's practices violate international consensus and Kenya's

National Standards by, *inter alia*:

   a.   establishing CCIs with the purpose of furthering political, religious or
        economic goals of First Love, rather than the purpose of offering children
        short term care and protection while long term solutions on family-based
        care are sought;

   b.   failing to counsel and support families to continue to care for their
        children;

   c.   failing to alternatively support the placement of the child in a family-based
        alternative care arrangement, such as, kinship care, foster care,
        guardianship or adoption;

   d.   failing to implement proper gatekeeping measures to ensure that
        placement in institutional care is in the best interests of the child and a last
        resort;

   e.   failing to use placement of children in First Love CCIs as a last resort;

f.  failing to use placement of children in First Love CCIs as a temporary measure, and instead regularly kept children in the CCIs for longer than three years;

g.  failing to implement practices to ensure that children are placed in a permanent family placement within the shortest period possible;

h.  failing to create a small, family-like environment in its CCIs and instead continuing to increase the size and institutional nature of the CCIs;

i.  failing to maintain or take any steps in an attempt to maintain the child as close as possible to his/ her habitual place of residence, in order to facilitate contact and potential reintegration with his/her family and to minimize disruption of his/her educational, cultural and social life;

j.  using financial and material poverty, or conditions directly and uniquely attributed to such poverty, as the justification for the removal of a child from parental or family care, rather than use such conditions as a signal for the need to provide appropriate support to the family;

k.  using education as a reason to admit or extend the stay of the children at First Love's CCIs;

l.  exploiting children by requiring them to lie to voluntourists as to the living status of their parents or families;

m.  exploiting children by requiring them to "perform" for voluntourists and by exposing them to short-term visitors, which can exacerbate their trauma from abandonment and further entrench attachment disorder;

n.  exploiting children by using and manipulating their likeness and details

41

online to deceive donors and increase donations;

o. exploiting children by failing to provide them with the personal care, life skills, and other services to prepare them for adulthood and life outside of an institution;

p. abandoning Care-Leavers at age 18 in cities far from their native homes without resources or assistance necessary for survival.

**3. Plaintiff and other Class Members raised concerns regarding First Love's illegal practices – and were threatened and warned to stay silent by First Love.**

181. After it became clear that First Love was not going to fix the ongoing problems and abuse at its CCI in Kenya, Ms. Calavan submitted a complaint entitled "FIRST LOVE CHILDREN'S HOME REPORT: STATEMENT OF KATHERINE CALAVAN AND EVIDENCE OF SYSTEMIC ABUSE OF CHILDREN IN THE CCI" and dated December 11, 2019 to the Kenya Department of Children's Services.

182. By February 2020, First Love's Tom Clinton was characterizing complaints by Plaintiff and others to Kenyan government authorities as the work of Satan, stating in an emailed newsletter to donors:

> Right now we are standing in the need of prayer for our ministries in Kenya. ***Our struggle is not against flesh and blood, but against the rulers, against the authorities, against the powers of this dark world and against the spiritual forces of evil in the heavenly realms. (Ephesians 6:12)*** Satan doesn't like what First Love is doing to help "the least of these" and he has proven this time and time again throughout the 20 years that we have been ministering in Kenya. I can't go into details on this, but right now he has turned up the heat once again, so I would ask that you go into warfare praying on behalf of our staff in Kenya.

(emphasis and color in original).

183. On May 27, 2020, a First Love donor and former volunteer wrote an email to

42

Tom Clinton and his wife, Linda, outlining her concerns about how children were treated in Kenya, about the recruiting of children to First Love CCIs, and about the deception relating to sponsor money.

184.     First, she highlighted her concern that First Love was kicking Care-Leavers out of First Love homes as soon as they turned 18 years old:

> *Putting Covid19 aside…. we were VERY upset about the 7 older [First Love] kids just being kicked out of Daraja back in March with such short notice, via a phone call…. Literally kicked out over the phone. What is the accountability report going to explain to all the donors who gave hundreds of thousands of dollars for Daraja to be used as a transitional living home for First Love kids, when in reality it is a hostel for other students as a source of income & profit for FL? It would be easy to use the Covid19 as a convenient[sic] excuse to explain why all the kids had to leave, but we know it happened back at the beginning of March BEFORE Covid shut things down.  We were on video phone with [student] and some of the others and they were very distraught. We heard the message from Cate on [student]'s phone, telling them to be out by noon on Sat. *** Why weren't the laws researched to know that Daraja would not legally be allowed to be used for FL kids BEFORE you fundraised $$hundreds of thousands?  And now the same thing is happening again with Mtwapa…hundreds of thousands of dollars fundraised under "false advertising" and now the property can't legally be used as intended.

185.     Next, she identified the fact that First Love continued to accept sponsorship money by misrepresenting that it provided a transition home for kids when they turned 18, even though First Love does not in fact do so. She explained:

> *[***] Like I shared concerns back at our December meeting, the original Daraja house concept of being a bridge from childhood to adulthood, turned out to basically just be a holding tank for them (a dormitory) but there was no programing in place to help with spiritual growth, life skills, money management, adulting, assist in job searches, etc. I also never understood why they had to be a college student to live there; you never answered my question on that.  The description on the website says:
>
> > First Love has constructed Daraja House in order to go full-circle with the orphan children God brings to

us. We feel that God would have us care for these kids just like any of you would care for your own children. The Kenyan Children's Department requires that once a child reaches the age of 18 he/she must move off the property of a children's home or orphanage. Since we do not want to just send our older kids back to the slums, we have opened a transition home for them, which we are calling Daraja (bridge in English) House. This building serves as a "bridge" from youth to adulthood for our older young people as they finish up high school, go to college, or get their first jobs.

Again, that is a misleading description or "false advertising" since only 7 of the older kids were allowed to live there. It says "or get their first jobs" not "only the ones going to college." What about [Care-Leaver] who is not college material? She literally just got kicked to the curb. The older kids who were sent back to the slums were not being cared for like we would any of our own older children who have graduated HS (which is what the description says). ***

So after Covid19…now that the older FL kids can't live at Daraja anymore, what is going to become of the building? Will honest communication be sent out to update the public and all the donors that it is no longer a home for First Love children?

186.     She asked about the First Love Board's accountability:

What does your board think of all of this and how are they handling things? The one thing you do have control/power over is the funding/fundraising coming in from the USA. If the funds are not being used properly on the Kenyan side, then you can easily cut things off from this end. Like if the $120 per month per child is not being used to give food to the sponsored children in their homes, then where is it all going? There needs to be accountability and tracking as to where all the sponsorship money is going.

187.     She also inquired about First Love's practice of recruiting children into orphanages when their parents are still living, including Purity.

188.     On June 9, 2020, Ms. Calavan submitted a supplement report to the Kenya DCS County Children's Coordinator "concerning potential trafficking of children to First Love Kenya."

189.     After Calavan complained to the Kenya Department of Children's Services,

Clinton threatened and caused Calavan to be threatened in several ways.

190.     On July 29, 2020, First Love's Secretary, Phillip Guske, sent Ms. Calavan an

email stating that they had contacted her church, apparently in an effort to ensure she did not

provide her allegations and evidence to governmental authorities, or to withdraw them. He stated

that, "As a board we have a duty to examine these charges thoroughly and determine their

validity. In examining the evidence we have it appears that a number of the more important

things you have accused FL, Clinton's, et al about have been either based on incomplete

information, misunderstandings or even exaggerations."

191.     He further advised her that:

> Because we wish to honor Christ we are seeking to engage you
> through a Matthew 18: 15-17 process to determine the evidence
> you may, or may not have. It is important that the facts be
> established since you presented these matters to the wider
> Christian community including donors and supporters. …we now
> seek to elevate it to the next level, your church (Matt.18:17). ***
> We trust that you will participate with us as our goal is, as I'm sure
> yours is as well,  to see the God  honored, His Kingdom promoted
> through Orphans and Widows Ministry and harmony between
> believers.

192.     Shortly thereafter, on August 13, 2020, Ms. Calavan received a letter from an

Illinois attorney acting on behalf of First Love. First Love's attorney threatened her for taking

her concerns to government officials and agencies in Kenya, and demanded that:

> you publicly retract your accusations and repeat our demand that
> you produce your "evidence" of wrongdoing. Further, we demand
> that you cease and desist from publishing in any fashion in any
> medium a continuation of these outrageous accusations or from
> manufacturing additional charges. Understand merely the
> publication of accusations of criminal conduct without a basis in
> truth or fact constitutes Libel and/or Slander per se. Although the
> actual damages to my clients are substantial and measurable, your
> malicious actions could result in punitive damages as well if legal
> action is taken.

45

(underlining in original).

193.    Clinton also posted a Facebook message with a picture that showed Russian President Putin bullying President Trump with the warning: "Oh be careful little mouth what you say…" (ellipsis in original). A copy follows:



### 4. The First Love Solicitation Enterprise includes organizations that exploit Kenyan children for their own benefit and at the expense of donors.

194.    First Love formed a network of similar corporations and CCIs through which they promoted their orphanage trafficking in Kenya under the guise of good will in order to expand their reach to prospective donors and increase donations from unsuspecting donors.

195.    First Love called this the "First Love Network," whose alleged purpose was to partner with other children's homes and feeding programs in the Nairobi area and "assist[] them with food, construction projects and child sponsorships. The First Love Network has provided services to Abbas House, African Children's Project, Morning Star children's homes and the

Little Lambs feeding program."[47]

196.  One of the companies in the First Love Network, Loving InDeed, Inc., was founded by First Love's Vice Chairman, Jerry Winslow.

197.  Formed in or about 2015, Loving InDeed holds itself out as being "formed by a group of like-minded people who wanted to do something to help others, but desired to maximize projects by pooling their money. They also wanted to have a say in selecting and determining projects and track and see the results of their financial contribution."[48]

198.  Loving InDeed lists both First Love International and Abba's House as partners.

199.  According to First Love, Abba's House was started in 2007 by Pastor Simon and Margaret Muhotato to build a home for children "left without parents" due to "political violence in Kenya."[49] Other organizations market that Abba's House was started for "orphans left by AIDS epidemic and civil unrest."[50]

200.  Both First Love and Loving InDeed collect money from American donors when that money is intended for Abba's House.

201.  First Love markets itself as "the organization that will process the donations given to Abba's House. Receipts and other correspondence have the First Love International name on them, as the official non-for-profit organization, but money donated will be distributed to Abba's House."[51]

202.  Similarly, Loving InDeed states: "Abba's House is a partner to Loving InDeed which is a registered 501(c)(3) and will be the organization that will issue IRS receipts[sic] at the

---

[47] https://firstloveinternational.com/ministry/kenya/ (last accessed October 30, 2020).
[48] https://lovingindeed.com/
[49] https://firstloveinternational kindful.com/?campaign=1017818
[50] https://www.salem-saukvalleychurches.com/simon-muhota.html
[51] https://firstloveinternational kindful.com/?campaign=1017818

end of the year. They collect money for general donation[sic] for projects and ongoing expenses. First Love Internaional[sic] is a registered 501(c)(3) and and[sic] collects money for children sponsorshil.[sic] They will be the organization that will issue IRS receipts[sic] at the end of the year."[52]

203.     Loving InDeed collects money from sponsors using PayPal, an online service using wire transfers:



204.     First Love also takes online payments:



205.     It is impossible to discern from publicly available information the scope of the

---

[52]https://lovingindeed.com/abbashouse/?fbclid=IwAR0aBVAkhZmdB_w6GqG8qk8dKxkPenT3Dw_DaW6fnPTRR2TxRXsMcl5I8Nc (all spelling mistakes in original).

partners in the First Love Solicitation Enterprise, the sites soliciting donations and which companies are processing them, or the truth or deception behind the hundreds of pictures of Kenyan children being housed in the First Love Network.

206. However, what is discernable is the myriad of ways in which the members of the First Love Solicitation Enterprise are deceiving Class Members – just like First Love – in order to obtain and increase donations.

207. Like First Love, the members of the First Love Solicitation Enterprise represent they are saving children from poverty or that have lost parents.

208. For example, one website soliciting donations for Abba's House and First Love features the pictures of 26 children and their profiles. [53]

209. The pictures reflect that either First Love and Abba's House are being deceptive with the information they provide *or* are keeping the children in a malnourished state to elicit more donations.

210. By way of example only, the website solicits sponsorship of a boy named Alex Njenga who is allegedly 15 years old and lives at Abba's House. Alex's picture, however, reflects a much younger child or a malnourished 15-year-old:[54]

---

[53]https://www.denarionline.com/DONORSERVICES/TEMPLATEPAGE.ASPX?COMP_REF=_LLAMBS&SID=rq4mghqzmnsb44kcsgcjq3nt&THEME=ABBAS&CONTENT=CHILDBIGLIST
[54]https://www.denarionline.com/DONORSERVICES/TEMPLATEPAGE.ASPX?COMP_REF=_LLAMBS&SID=rq4mghqzmnsb44kcsgcjq3nt&THEME=ABBAS&CONTENT=CHILDBIGLIST



211.     In another example of soliciting donors to sponsor a child, the website lists Charity Chepkiemoi as a 15-year-old girl who is in pre-school and "came to the home from an area called Pokot. She didn't know how to speak English or Kiswahili":



212.     Abba's House and First Love tell donors that they can sponsor a child "for as many years as you like (all the way through high school and even on to college)." They say that the sponsorship money "is used for food, clothing, security, education, medical and other expenses that any parent would incur in caring for their own child."[55]

213.     In another example, on April 10, 2020, Abba's House posted the pictures of approximately 40 children on Facebook that it purportedly houses, listing them each by age.

214.     Reflecting the interdependent nature of the members of the First Love Network Solicitation Enterprise, in a video on Facebook highlighting its most recent annual report, Abba's

---

[55] https://www.denarionline.com/DONORSERVICES/TEMPLATEPAGE.ASPX?COMP_REF=_LLAMBS&SID=rq4mghqzmnsb44kcsgcjq3nt&THEME=ABBAS&CONTENT=CHILDBIGLIST

House reported that it constructed "The Big Boys & Girls' Dormitories" "Done by the #Loving In Deed":[56]



215. And in another Facebook post, Abba's House posted a link to what appears to be a joint newsletter from "Abba's House Kenya/Loving InDeed, Inc.," reporting on a then-upcoming November 2019 trip to Kenya by a group of Americans, including Winslow.

216. The newsletter reported, *inter alia*: "We once again have the honor to serve our Lord by traveling to Kenya to build furniture for Abba's House and First Love Kenya. We will spend the first week at the First Love site, using their workshop to build beds, tables, night stands, and school desks for Abba's House, Little Lambs, and First Love. We will then transport the furniture to Abba's House to assemble and install them."[57]

217. Further, the newsletter solicited donations for "kids at Abba's house that need to be sponsored."[58] Clicking on the donation button in that newsletter takes the reader to a website for "Abba's House and "First Love Network."[59]

---

[56] https://www.facebook.com/366808503445785/videos/232409554487833
[57] https://mailchi mp/1e1e8b23e9fd/fall-2019-update-952505?fbclid=IwAR00BoVfAeAGx5AyED1QrAMqfMW8jmwNB5O99CpNpGyZ0jug TE0Er6sAyS0 (last accessed Oct. 30, 2020).
[58] https://mailchi mp/1e1e8b23e9fd/fall-2019-update-952505?fbclid=IwAR00BoVfAeAGx5AyED1QrAMqfMW8jmwNB5O99CpNpGyZ0jug TE0Er6sAyS0
[59] https://www.denarionline.com/DONORSERVICES/TEMPLATEPAGE.ASPX?COMP

51

218.     Like the other members of the First Love Solicitation Enterprise, Little Lambs

Kenya represents that it helps children "made vulnerable by poverty and HIV/AIDS."[60]

219.     Little Lambs operates two centers: "One in a poor section of the city of Nakuru.

The second on a rural hillside outside Kijabe."[61]

220.     Little Lambs admits that its operation staff "are Kenyan nationals who identify

children for the program and administer their care through a team of Kenyan teachers, cooks and

caregivers." In other words, they go into villages and procure children, rather than supporting

families to help them provide the care the children need.

221.     Little Lambs solicits donors on its website, including for child sponsorships. Little

Lambs states: "Your $38 or $76 per month gift provides meals, school fees, uniforms, and basic

medical care all delivered in a loving Christian environment."

222.     According to Little Lambs, its "child sponsorship donations are processed by First

Love."[62] Clicking on the website to donate takes the donor to the First Love website to make an

online donation:



---

REF=_LLAMBS&SID=rq4mghqzmnsb44kcsgcjq3nt&THEME=ABBAS&CONTENT= CHILDBIGLIST
[60] https://www.littlelambskenya.com/
[61] https://www.littlelambskenya.com/
[62] https://www.littlelambskenya.com/sponsor-a-child-1

223.     As to Plaintiffs and the Class, First Love and the First Love Solicitation Enterprise deceived them in to donating money, resources, and time by leading them to believe that First Love and the First Love Solicitation Enterprise's work followed all international and local best practices in the best interests of the children. In fact, First Love and the First Love Solicitation Enterprise:

    a.   Failed to refer Plaintiffs and the Class to Kenya's National Standards for Best Practices in Charitable Children's Institutions in order to conceal their wrongdoing;

    b.   Failed to disclose that First Love and the First Love Network violate international consensus governing orphanage trafficking and Kenya's National Standards for Best Practices in Charitable Children's Institutions;

    c.   Failed to disclose that First Love did not have proper gatekeeping measures to ensure that placement in institutional care is in the best interests of the child and a last resort;

    d.   Failed to disclose that the children in First Love's CCIs are not orphans as commonly understood by Americans in that one or both of the children's parents or close family members are typically living;

    e.   Deceived Plaintiff and the Class by marketing the financial and material poverty, or conditions directly and uniquely attributed to such poverty, in Kenya as an appropriate and accepted justification for the removal of a child from family care;

    f.   Deceived Plaintiff and the Class by marketing education as a reason to admit or extend the stay of the children at First Love's CCIs;

g.  Deceived Plaintiff and the Class by misrepresenting, and causing Children to misrepresent, the living status of the children's parents or families;

h.  Deceived Plaintiff and the Class by requiring Children to "perform" for them;

i.  Deceived Plaintiff and the Class by representing that the short-term visits would benefit the Children, without disclosing that such short-term visits are harmful to the normal social and emotional growth of the children; and

j.  Deceived Plaintiff and the Class by using and manipulating Children' likeness and details online to deceive donors and increase donations.

## CLASS ALLEGATIONS

224.    Plaintiff brings this action both on behalf of herself, and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following Class (the "Class"):

> All persons in the United States who made donations of time or money to First Love International Ministries or Loving InDeed, Inc. directly or for the benefit of Abba's House, Little Lambs Kenya, or John Doe Co-Conspirators.

225.    Excluded from the Class are Defendants, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

226.    Plaintiff does not know the exact number of Class members at this time but expects that the Class members are ascertainable through Defendants' books and records. Plaintiff reasonably believes that there are hundreds, and likely thousands, of Class members, geographically dispersed throughout the United States such that joinder of all Class members is impracticable.

227.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff made

54

contributions of time and money to First Love. All Class members were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

228.    Numerous questions of law or fact arise from Defendants' conduct that are common to the Class, including but not limited to:

        a.   The nature of the misrepresentations made by Defendants;

        b.   The nature of the omissions of material fact by Defendants;

        c.   Whether Defendants engaged in a pattern of racketeering activity;

        d.   Whether the First Love Solicitation Enterprise exists, and whether Defendants participated in the RICO enterprise;

        e.   Whether Defendants' conduct herein violated 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO);

        f.   Whether Defendants violated state consumer protection acts;

        g.   Whether Defendants were unjustly enriched;

        h.   Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

        i.   The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

229.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

230.    Plaintiff will fairly and adequately represent the interests of the Class in that she has no conflict with any other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in class actions and other complex litigation.

231. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

232. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

233. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF 18 U.S.C. § 1962(C)

234. Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein and further alleges as follows.

**1. The association in fact.**

235. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation ofn18 U.S.C. § 1962(c).

236. The First Love Solicitation Enterprise is an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Defendants, including their employees and agents, and (ii) the members of the First Love Network, including but not limited Loving InDeed, Abbas House, African Children's Project, Morning Star children's homes and African Inland Ministries d/b/a Little Lambs Kenya.

237. The Defendant "persons" are distinct from the First Love Solicitation Enterprise.

56

238. The First Love Solicitation Enterprise is open-ended and continuous.

## 2. The common purpose.

239. The First Love Solicitation Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) raising money to enrich themselves or their organization through activities that contravene international norms and Kenyan standard; (ii) exploiting children; (iii) misleading donors and voluntourists; and (iv) harassing and threatening Class Members to prevent the reporting, disclosure, or prosecution of members of the First Love Solicitation Enterprise.

## 3. The roles of the participants.

240. Each member of the First Love Solicitation Enterprise participated in the affairs of the enterprise by engaging in misrepresentations and omissions of material fact to procure donations of time and money through deception.

241. First Love, including its Board Members, established the method by which the members of the Enterprise exploited children for its own benefit, which methods were adopted by Abba's House.

242. Similarly, Loving InDeed perpetuated the marketing of children at First Love's CCIs and Abba's House to procure donors.

243. First Love and Loving InDeed collected money for themselves and for other members of the First Love Solicitation Enterprise.

244. First Love and its Board Members caused Plaintiff and other persons who complained about First Love's deceptive practices to be harassed and threatened to prevent the reporting, disclosure, or prosecution of members of the First Love Solicitation Enterprise.

## 4. Pattern of racketeering and predicate acts.

245. The Defendants have conducted and participated in the affairs of the First Love

Solicitation Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C.

§§ 1961(1) and 1961(5), which includes (i) multiple instances of tampering with a witness in

violation of 18 U.S.C. § 1512, and (ii) multiple instances of mail and wire fraud as described

throughout and below. This violated of 18 U.S.C. § 1341, the federal mail fraud statute, which is

a form of "racketeering activity."

246.    First Love, its Board Members, and its attorney tampered with one or more

victims in violation of 18 U.S.C. § 1512, each instance of which constitutes a predicate act.

247.    18 U.S.C. § 1512, entitled "Tampering with a witness, victim, or informant,"

provides in pertinent part:

> (b) Whoever knowingly uses intimidation, threatens, or corruptly
> persuades another person, or attempts to do so, or engages in misleading
> conduct toward another person, with intent to—
>
> (1) influence, delay, or prevent the testimony of any person in an
> official proceeding;
>
> (2) cause or induce any person to—
>
> (A) withhold testimony, or withhold a record, document, or other object
> from an official proceeding;
>
> (B) alter, destroy, mutilate, or conceal an object with intent to impair the
> object's integrity or availability for use in an official proceeding;
>
> (C) evade legal process summoning that person to appear as a witness, or
> to produce a record, document, or other object, in an official
> proceeding; or
>
> (D) be absent from an official proceeding to which such person has been
> summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense….

248.    Here, First Love, Clinton, and members of the First Love Board used intimidation and threats and caused others to use intimidation and threats to hinder, delay, or prevent the communication of the facts alleged herein.

249.    Further, Defendants used the mails and wires for the transmission, delivery, or shipment of the following by the Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' scheme:

    a.   Communications, including emails, texts, and messages via social media or other apps (e.g., Facebook and WhatsApp), between First Love, Board Members, and First Love Kenyan CCIs related to the procurement of children, operations, fundraising, expenditures, construction, and planning for mission trips that would include voluntourists;

    b.   Marketing via social media (such as Facebook), emails, newsletter (e.g., through MailChimp) to target Class members for donations of time and money;

    c.   Communications via social media (such as Facebook), emails, and other applications with churches and other religious or educational organizations in which prospective donors and Class members participate to expand First Love's reach and obtain donations of time and money;

    d.   Wires reflecting the payment of money from Class members to First Love, and from First Love to its accounts domestically and abroad;

    e.   Communications, including emails, texts, and messages via social media or other apps between Defendants and members of the First Love

Solicitation Enterprise related to the procurement of children, operations, fundraising, expenditures, construction, planning for mission trips that would include voluntourists;

f. Agreements between Defendants and members of the First Love Solicitation Enterprise relating to the collection of money by one member for the benefit of the other member;

g. Wires reflecting the payment of money from Class members to First Love (or another member of the First Love Solicitation Enterprise, such as Loving InDeed) for the benefit of another member, and wires reflecting the payment of all or a portion of such money to the member's accounts domestically and abroad;

250. Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

251. Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.

252. Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the scheme.

### 5. Affected interstate commerce.

253. The First Love Solicitation Enterprise engaged in and affected interstate commerce, because, inter alia, it procured donations from United States citizens nationwide.

### 6. Operating and Management

254. Defendants each exerted some measure of control over the First Love Solicitation

Enterprise, and Defendants participated in the operation or management of the affairs of the First Love Solicitation.

255.    Within the First Love Solicitation Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The First Love Solicitation Enterprise used this common communication network for the purpose of procuring donations through misrepresentations and omissions of material fact.

256.    Each participant in the First Love Solicitation Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing coordination of their activities. Through the First Love Solicitation Enterprise, Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

257.    To achieve their common goals, Defendants hid from the general public the unlawfulness of their conduct and suppressed and/or ignored warnings from third parties regarding the legality of their conduct.

258.    Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to cause Plaintiff and others to donate time and money to First Love and the enterprise members and to hide and conceal First Love's conduct. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to the property of the Class.

259.    The pattern of racketeering activity alleged herein and First Love are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein

for the purpose of conducting the affairs of the First Love Solicitation Enterprise.

### 7. RICO injury.

260.     Plaintiff has been injured in their property and business by reason of these violations in that they gave their time and money under false pretenses.

261.     Had members of the First Love Solicitation Enterprise not been complicit and had they revealed instead of concealed the failure to abide by international consensus and Kenyan policy on orphanage trafficking, Plaintiff and members of the Class would not have been injured. Thus, their injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

262.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff and Class members for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT II

### VIOLATION OF 18 U.S.C. § 1962(D)

### (CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(C))

263.     Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein and further alleges as follows.

264.     Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

265.     Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

266.     As demonstrated in detail above, Defendants' co-conspirators have engaged in

numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of tampering with a victim or witness in violation of 18 U.S.C. § 1512, as well as instances of mail and wire fraud.

267. The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. At all relevant times, all Defendants and their co-conspirators were aware of the essential nature and scope of the First Love Solicitation Enterprise and intended to participate in it.

268. As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and Class Members have been and are continuing to be injured in their business or property, as set forth more fully above.

269. Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## COUNT III

## VIOLATION OF STATE CONSUMER PROTECTION ACTS

270. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

271. Plaintiff brings this Count individually, and on behalf of all similarly situated residents of each of the 50 states for violations of the state consumer protection acts, or that

63

subset of states in which Class members reside, including:

    a.   the Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, et seq.;

    b.   the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, et seq.;

    c.   the Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, et seq.;

    d.   the California Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. and 17500, et seq.;

    e.   the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq.;

    f.   the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-101, et seq.;

    g.   the Connecticut Unfair Trade Practices Act, Conn. Gen Stat. Ann. § 42-110, et seq.;

    h.   the Delaware Consumer Fraud Act, 6 Del. Code § 2513, et seq.;

    i.   the D.C. Consumer Protection Procedures Act, D.C. Code § 28-3901, et seq.;

    j.   the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, et seq.;

    k.   the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, et seq.;

    l.   the Hawaii Unfair Competition Law, Haw. Rev. Stat. § 480-2, et seq.;

    m.   the Idaho Consumer Protection Act, Idaho Code. Ann. § 48-601, et seq.;

n.   the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1, et seq.;

o.   the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-2, et seq.;

p.   the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623, et seq.;

q.   the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, et seq.;

r.   the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, et seq.;

s.   the Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. Tit. 5, § 207, et seq.;

t.   the Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301, et seq.;

u.   the Massachusetts Regulation of Business Practices for Consumers Protection Act, Mass. Gen Laws Ann. Ch. 93A, et seq.;

v.   the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, et seq.;

w.   the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F, et seq.;

x.   the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407, et seq.;

y.   the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601, et seq.;

z.   the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600, et seq.

aa. the New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. § 358-A:1, et seq.;

bb. the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8, et seq.;

cc. the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, et seq.;

dd. the New York Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349, et seq.;

ee. the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, et seq.;

ff. the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15, et seq.;

gg. the Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, et seq.;

hh. the Oklahoma Consumer Protection Act, Okla. Stat. tit. 15 § 751, et seq.;

ii. the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, et seq.;

jj. the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq.;

kk. the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-5.2(B), et seq.;

ll. the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.;

mm. the South Dakota Deceptive Trade Practices and Consumer Protection, S.D. Codified Laws § 37-24-1, et seq.;

nn. the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101, et

66

seq.;

oo. the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Code Ann., Bus. & Con. § 17.41, et seq.;

pp. the Utah Consumer Sales Practices Act, Utah Code. Ann. § 13-11-175, et seq.;

qq. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, et seq.;

rr. the Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-199, et seq.;

ss. the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, et seq.;

tt. the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A, et seq.;

uu. the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, et seq.; and

vv. the Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-101, et seq.

272. The acts, practices, misrepresentations, and omissions by Defendants described above, and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above-enumerated statutes.

273. Defendants' acts and practices created a likelihood of confusion or of misunderstanding and misled, deceived, or damaged Plaintiffs and members of the Class in

67

connection with the procurement of donations of time and money to support Defendants' CCIs in Kenya. Defendants' conduct also constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged in violation of each of the above-enumerated statutes.

274. Plaintiff, on behalf of herself and the other Class members, seek monetary damages, treble damages and such other and further relief as set forth in each of the above enumerated statutes.

## COUNT IV

## UNJUST ENRICHMENT

275. Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein and further alleges as follows.

276. At all times relevant hereto, Defendants collected money from Plaintiff and the Class members for their own purposes and not for the best interests of the children.

277. Defendants benefitted from their unlawful acts by receiving donations from Plaintiffs and the Class.

278. Plaintiffs and members of the Class conferred benefits that were non-gratuitous upon Defendants, without knowledge that Defendants' acts and practices violated international norms and Kenyan policies regulating CCIs.

279. Defendants appreciated, or had knowledge of, the non-gratuitous benefits conferred upon them by Plaintiffs and members of the Class.

280. Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiffs and members of the Class, with full knowledge and awareness that, because of

Defendants' unconscionable wrongdoing, the donations from Plaintiffs and members of the Class were not helping children in ways that were in the children's best interests and reasonable donors would have expected.

281.    Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and members of the Class under these circumstances made Defendants' retention of the non-gratuitous benefits unjust and inequitable.

282.    Because Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and members of the Class is unjust and inequitable, Plaintiffs and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on her behalf and on behalf of the Class herein, adjudging and decreeing that:

A.  This action may proceed as a class action, with Plaintiff as the designated Class representative and her counsel as Class Counsel;

B.  Plaintiff and the members of the Class recover damages sustained by them, as provided by statutory or common law, and that a judgment in favor of Plaintiff and the Class be entered against the Defendants;

C.  Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

D.  Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

E.  Plaintiff and members of the Class receive such other and further relief as may be just

and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the

claims asserted in this Complaint so triable.

Dated:          January 12, 2021                    FEGAN SCOTT LLC


By:___*/s/ Elizabeth A. Fegan*_____

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@hbsslaw.com

Michael J. Summerhill
NIXON PEABODY
70 West Madison St.
Suite 3500
Chicago, IL 60602
Phone: 312-977-9224
Fax: 833-958-1193


*Counsel for Plaintiff and the
proposed Class*